UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

FEDERATED RETAIL HOLDINGS, INC.,
MACY'S DEPARTMENT STORES, INC.,
MACYS.COM, INC., and MACY'S
MERCHANDISING GROUP, INC.

       Plaintiffs,

   -v-                                              No.  06 Civ. 6119 (LTS)(THK)

SANIDOWN, INC.,

       Defendant.

--------------------------------------------------------x


**OPINION AND ORDER**


APPEARANCES:

SUZANNE WOODWARD, ESQ.       WARNER & SCHEUERMAN
BETTY T. TIERNEY, ESQ.          By: Jonathon David Warner, Esq.
KALIN M. WALKER, ESQ.        6 West 18th Street
Macy's, Inc.                        10th Floor
611 Olive Street              New York, New York 10011
St. Louis, Missouri 63101

*Counsel for Plaintiffs*          *Counsel for Defendant*

LAURA TAYLOR SWAIN, United States District Judge

Plaintiffs Federated Retail Holdings, Inc., Macy's Department Stores, Inc., Macys.com, Inc., and Macy's Merchandising Group, Inc. (collectively "Macy's" or "Plaintiffs") brought this action against Defendant Sanidown, Inc. ("Defendant" or "Sanidown"), asserting claims under the New York Uniform Commercial Code ("N.Y. U.C.C.") and New York General Business Law Section 349 ("Section 349"), as well as claims for fraud in the inducement and unjust enrichment, all arising from the parties' dealings with respect to down and feather bedding to be sold by Plaintiffs in the spring and fall of 2006.  Defendant interposed counterclaims pursuant to the N.Y. U.C.C.[1]  The Court has jurisdiction of the action pursuant to 28 U.S.C. § 1332.

Plaintiffs' claims and Defendant's remaining counterclaims were tried to the bench in November and December 2009.  After the conclusion of Plaintiffs' case in chief, the Court granted in part Defendant's motion pursuant to Rule 50 of the Federal Rules of Civil Procedure, dismissing Plaintiffs' Section 349 claim, claims relating to the Fall 2006 contract, and claims relating to the Spring 2006 contract insofar as they were premised on N.Y. U.C.C. § 2-612.  (See docket entry no. 112 ("Dec. 16, 2009, Order").)  The parties submitted post-trial proposed findings of fact and conclusions of law and memoranda in support thereof.  The Court observed carefully the demeanor and testimony of the witnesses and has considered thoroughly all of the parties' submissions and arguments as well as the trial record.

This Opinion and Order constitutes the Court's findings of fact and conclusions of law in accordance with Rule 52 of the Federal Rules of Civil Procedure.  To the extent any

---

[1]     Defendant's additional fraudulent inducement and unjust enrichment counterclaims were dismissed prior to trial.  (See docket entry no. 81 ("Aug. 5, 2009, Decision") at 8-10.)

finding of fact constitutes or incorporates a conclusion of law it is to be deemed a conclusion of

law.  Similarly, any conclusion of law that constitutes or incorporates a finding of fact is to be

deemed a finding of fact.

FINDINGS OF FACT

The Court's findings of fact are based on the trial record.

For approximately fifteen years, Defendant supplied Plaintiffs with down- and

feather-filled products, including pillows, comforters, and featherbeds, which Plaintiffs resold in

their retail stores.  (Tr. 435:10-13, 745:7-11.)  The parties ordinarily contracted for the supply of

these goods, according to specifications agreed upon by the parties and in quantities determined by

Plaintiffs, for each of two seasons, spring and fall, each year.  (Tr. 384:25-386:1 (discussing the

process with respect to the "spring 2006 assortment"), 386:5-15 (discussing the fall 2006 season),

387:11-388:5, 775:2-776:4; Ex. 21 (specifications for Fall 2006 products).)  These contracts were

memorialized in "projections" reflecting the price and anticipated number of goods that were to be

supplied by Defendant each month during each season's "six-month delivery cycle."  (Tr. 385:19-

386:1, 399:4-10; Exs. B, SS.)

Over the course of each contract period, Plaintiffs periodically ordered specific

quantities of goods that roughly corresponded to the quantities forecast in the projection document,

and Defendant then manufactured and delivered the ordered goods to Plaintiffs.  (Tr. 399:11-

400:6.)  In a given season, Plaintiffs sold that season's products along with any products left over

from the prior season.  (Tr. 385:10-13, 387:6-8.)  Defendant agreed to adhere to Plaintiffs'

procedures pertaining to shipping and labeling (Tr. 392:9-24), and to incur expense offsets, or

"chargebacks," for procedural non-compliance (Tr. 400:7-401:2).  The procedures that Plaintiffs'

vendors are required to follow in the packaging and delivery of merchandise are delineated in a

manual that is available on Plaintiffs' internet site.  (Tr. 491:2-16; Ex. 86 (the "vendor standards manual").)

George Frenkel, the president of Sanidown (Tr. 812:2-4), testified that when he negotiated the prices at which Defendant would sell merchandise to Plaintiffs, he "would usually start [negotiations] at 140 percent" of Defendant's cost and that he "usually" achieved a profit margin of thirty percent on the agreed price.  (Tr.779:5-781:12, 870:18-871:11.)  Frenkel testified credibly that Defendant earned a similar profit margin on goods sold to other retailers.  (Tr. 781:13-25.)  If Defendant had sold merchandise at 140 percent of its costs, then 28.57 percent (i.e., 40/140) of its revenue would have exceeded its costs, and thus constituted profit.  Since Frenkel testified that he opened negotiations with a price forty percent greater than his costs, and since even that price would produce a profit margin of less than twenty-nine percent, the Court construes Frenkel's testimony as evidence that he typically settled for a price thirty percent greater than his costs, yielding a profit margin of 23.08 percent (i.e., 30/130).  The Court finds that Defendant has proved by a preponderance of the evidence that its typical profit margin on the relevant goods was 23.08 percent.

Defendant claimed that Plaintiffs withheld $2,782,505.87 in chargebacks between January 1, 2000, and October 31, 2006, all without justification, of which $460,715.71 was ultimately paid to Defendant.  (Tr. 966:24-967:1, 1015:7-1018:10; Exs. E, E1, VV.)  Defendant failed to proffer credible evidence substantiating its assertion as to outstanding unjustified chargebacks.  Defendant relied principally upon documents prepared by Defendant's factor that failed to differentiate between "expense offsets" and other deductions (Exs. E, VV; Tr. 1025:2-1026:21, 1029:13-15), failed to identify the individual deductions with particular invoices (Tr. 1026:22-1027:3), and may have included deductions taken against Defendant by buyers other than

Plaintiffs (Tr. 1031:16-1032:3).

Plaintiffs' evidence shows that they withheld $126,193[2] in "expense offsets"

between January 1, 2000, and December 31, 2005 (Tr. 515:17-517:14; Exs. 117-122, 124-128),

and an additional $28,108.95 in such offsets in 2006 (Tr. 560:21-561:14; Ex. 112).  The expense

offsets related to alleged violations of Plaintiffs' vendor standards manual, such as improper

labeling of boxes of merchandise, untimely shipping notices, and other shipping-related violations

of Plaintiffs' standards.  (Tr. 491:3-496:1.)  The evidence established that Plaintiffs thoroughly

documented the occurrence of these expense offsets and had noted the reason given for each by the

distribution centers, but no evidence was presented that those reasons reflected accurately the

actual condition, timeliness or other relevant aspects of the shipment associated with the expense

offsets.  (See Tr. 521:2-523:6, 529:2-3, 570:19-572:23.)  Plaintiffs have therefore failed to establish

that any of these "expense offsets" was actually warranted by Defendant's actions.

The parties entered into separate contracts for the Spring 2006 and Fall 2006

seasons.  (Tr. 384:25-386:3, 426:18-23, 774:6-11.)  In August 2005, Plaintiffs issued projections

for the Spring 2006 contract (Tr. 385:19-386:1) which provided that Defendant was to supply to

Plaintiffs three types of Appalachian Comforters, three types of Tahoe Comforters, two types of

Mt. Evans Pillows, two types of Matterhorn Pillows, two types of Euro Square Pillows, and five

types of Matterhorn Featherbeds (Tr. 385:8-13; Ex. SS).  In February 2006, Plaintiffs issued

---

[2]      There was testimony that this amount was approximately $137,000, but that
         larger amount was computed by taking the sum of credits and deductions
         reflected in periodic reports that overlapped for the period from January 1, 2001,
         to February 3, 2001.  (Tr. 501:3-507:16; Exs. 117, 118.)  Another set of
         documents containing the same data (as well as additional details) and arranged in
         non-overlapping periods shows that $10,959.40 was taken in net deductions
         during the period of overlap, causing that amount to be counted twice in the
         $137,000 figure.  (See Tr. 516:2-17; Exs. 117, 124.)

projections for the Fall 2006 contract (Tr. 386:5-10) which provided that Defendant was to supply

to Plaintiffs four types of Hotel Comforters, three types of Appalachian Comforters, two types of

Tahoe Comforters, two types of Matterhorn Pillows, and two types of Euro Square Pillows (Ex.

B1; Tr. 386:12-15).  The Fall 2006 projections document also listed five types of Matterhorn

Featherbeds but, unlike the other products listed, did not indicate a price for those items.  (See Ex.

B1.)  The Matterhorn Featherbeds were listed on the May 31, 2006, and June 26, 2006, inventories,

which reflected then-outstanding orders for the Fall 2006 contract, including for Matterhorn

Featherbeds, and indicated Fall 2006 "first cost" figures.  (Exs. J ("May 31, 2006, Inventory"), K

("June 26, 2006, Inventory").)  The Court finds that the Matterhorn Featherbeds were included in

the Fall 2006 contract and that the total monetary value of the Fall 2006 contract was $8,432,075,

based on the pricing enumerated in the Fall 2006 projections document and the Matterhorn

Featherbeds' "first costs" as documented in the June 26, 2006, inventory.

   In January 2006, prior to the consummation of the Fall 2006 contract negotiations,

Plaintiffs took a $150,000 rebate against their outstanding invoices from Defendant, to which

Frenkel claimed he acceded only as part of the complete Fall 2006 program.  (Tr. 766:6-11.)  The

Court finds that Plaintiffs' withholding of this rebate was justified in light of Defendant's

accession, in return for which Defendant was able to secure agreement as to the Fall 2006 contract.

   In April 2006, Plaintiffs learned that the California Bureau of Home Furnishings

and Thermal Insulation ("CBHF"), which licenses and regulates the bedding industry in California,

had issued a statewide "withhold from sale order" prohibiting Plaintiffs from selling any of

Defendant's products in California.  (Tr. 62:8-63:3, 108:6-25, 402:7-9; Ex. 40.)  The order was

issued after the CBHF determined that Defendant's license to do business in California had lapsed

and that certain Matterhorn Comforters produced by Defendant violated a California law requiring

that products labeled as "down" contain at least seventy-five percent down.  (Ex. 40.)  Plaintiffs'

Associate Counsel, Fawn Horvath, contacted Defendant's president, George Frenkel, about the

CBHF situation.  Frenkel told Horvath that the finding of mislabeling was unfounded, that he

would resolve the licensing problem, and that the "withhold from sale order" would be withdrawn.

(Tr. 109:3-110:10.)  Approximately one week later, that order was narrowed to cover only one

product, the Matterhorn Comforter, with a particular "lot number," 11777.[3]  (Tr. 110:24-112:6; Ex.

50.)  Ms. Horvath again spoke to Mr. Frenkel, who advised her that any product problem was

limited to the 11777 lot.  (Tr. 111:1-7.)

Marissa Nono, Plaintiffs' Senior Products Manager in the area of "utility" bedding,

also had several conversations with George Frenkel about the CBHF order.  Frenkel agreed to

accept the return of all Matterhorn Comforters from Plaintiffs because, although the withhold order

had been narrowed to a single lot number, it would have not been feasible for Plaintiffs to identify

the specific lot to which each individual comforter belonged.  (Tr. 402:25-403:13, 434:15-23,

762:8-20; see also Tr. 111:9-14.)  Plaintiffs placed a "hold" on $110,000 in payments on

Defendant's outstanding invoices as compensation for the returned Matterhorn Comforters.  (Tr.

898:3-17.)  The CBHF withhold from sale order was ultimately withdrawn in its entirety.  (Ex. 53.)

In May 2006, Plaintiffs learned that, several months earlier, the American Down

and Feather Council ("ADFC"), a trade organization, had also tested the contents of some of

Defendant's Matterhorn Comforter products and found them to violate industry labeling standards

---

[3]     The lot number on a product identifies the shipping container in which the filling
contained in the product arrived at Defendant's facility.  A typical down shipment
contained 200 forty-pound bags of down.  There is conflicting testimony and
documentary evidence as to whether the lot number in question is 11777 or
11177.  However, the parties are in agreement that only one lot is at issue with
respect to the CBHF testing.  The Court refers to that lot as number 11777.

in that their filling content differed from that specified on their labels.  (Tr. 113:5-13; Exs. 32-38.)

The offending products came from several lots in addition to lot 11777, namely lots 11071, 11085,

11480, 20830, and 21006.  (Exs. 28, 30, 65A-65E.)  Frenkel did not notify Marissa Nono of the

ADFC tests, nor did he alert her to the fact that Matterhorn Comforters from more than one lot had

reportedly failed testing.  (Tr. 402:14-24.)  Nono and Horvath eventually became aware of the

ADFC test results.  (Tr. 404:18-405:1.)  When Horvath spoke to Frenkel about the ADFC test

results, Frenkel dismissed them as the product of an ill-intentioned effort by the ADFC, which was

comprised of Defendant's competitors, to make trouble for him.  (Tr. 114:13-23.)

   On May 24, 2006, Nono and another Macy's employee visited Defendant's facility

and met with Frenkel and two other Sanidown employees.  During the visit, Nono and Frenkel

discussed many aspects of their business relationship, including manufacturing processes, shipping,

finances, and Nono's "concern" that the remainder of Defendant's products must pass future

content tests.  (Tr. 405:11-412:17, 420:3-421:4, 449:2-25; Ex. B2.)  Frenkel told Nono that his

company's products would pass those tests.  (Tr. 40407:11-14.)  Nono also requested that

Defendant begin shipping Fall 2006 merchandise and informed Frenkel that a "hold" on

approximately $280,000 in payments due to Sanidown for previously-delivered merchandise had

been limited to $110,000, the amount relating to the Matterhorn Comforters that Defendant had

agreed to take back.  (Tr. 442:3-446:14, 449:2-6, 767:9-769:15; Ex. QQ1.)[4]  Relying on Nono's

representation that the payment "hold" had been reduced to $110,000, Defendant commenced the

manufacture of Fall 2006 merchandise and shipped $862,000 worth of those goods.  (Tr. 429:1-5,

771:13-772:7, 778:25-779:1; Ex. NN.)

---

   [4]  Only approximately 1,500 Matterhorn Comforters, worth $68,000, were
ultimately returned to Defendant.

In May 2006, Plaintiffs commissioned tests by the International Down and Feather Testing Laboratory & Institute ("IDFL") of several products supplied by Defendant.  In June 2006, Plaintiffs received the results of these additional content tests, which revealed that a number of the products did not contain the amount or type of down required by the specifications, and identified failures to comply with industry standards that were not expressly incorporated into the parties' agreements.[5]  (Tr. 226:7- 244:25; Exs. 65E-65W.)  The goods tested included ones from lot numbers 10321, 20124, and 20217.  (Exs. 65I-65T.)  Some time after June 15, 2006, Leonard Marcus, the President of Macy's Merchandising Group, decided to cancel Plaintiffs' contracts with Defendant on the basis of the results of the earlier tests relating to Matterhorn Comforters, the new tests relating to other products, and Defendant's failure to alert Plaintiffs of the adverse Matterhorn Comforter ADFC test results.  (700:2-704:5.)  Nono conveyed Marcus's decision to Frenkel in a telephone conversation on June 21, 2006, and told Frenkel that all Sanidown goods in Macy's possession would be returned to Sanidown.  (Tr. 461:10-12, 878:8-10.)

Defendant disputes the propriety of the methods employed by IDFL, whose president also served as Plaintiffs' expert at trial, as well as Plaintiffs' reliance on a small number of samples to reject all of Defendant's products then in stock in Plaintiffs' stores.  (Tr. 1083:1-1084:16, 1087:3-23, 1100:15-1106:8.)   Whatever the merits of Defendant's contentions in this regard, Defendant conceded – to Plaintiffs in 2006 and at trial – that it had manufactured goods for Plaintiffs using raw material from the wrong lots, resulting in the use of the wrong type of down to

---

[5]     The contracts contained no specifications relating to other product characteristics, such as turbidity, residue, down cluster, oxygen level, and broken feather content, that are standard industry measures of the quality of down and feather products. The parties dispute the relevance of these characteristics to the adequacy of the products manufactured by Defendant under the contracts in suit.  The Court finds it unnecessary to resolve this issue as the discrepancies with respect to the down content, alone, suffice to establish non-conformity.

fill a number of items.  (Tr. 420:17-22 (relating statement from Frenkel that goods supplied to Plaintiffs should have had lot numbers beginning with the digit "9" and that he had found merchandise in one store whose lot numbers began with a "2"), 900:2-15, 914:2-917:7, 920:16-921:6.)  While the employee who oversaw Defendant's receipt of the returned goods testified that all such goods belonged to a lot whose number began with a "9" (Tr. 902:2-8), Plaintiffs had no way of feasibly establishing that fact and the IDFL tests confirm that, at some time in the spring of 2006, Plaintiffs were in possession of products from several non-conforming lots. Furthermore, Defendant apparently kept no records correlating specific lots with particular finished items, and was unable to establish the extent of the use of materials from improper lots. (See, e.g., Tr. 326:14-23.)  In light of the presence of merchandise in Plaintiffs' stores filled from multiple lots containing duck down, rather than goose down, the size of each lot of down (up to approximately 8,000 pounds of down (Tr. 255:16-19, 327:5-21, 328:8-17, 916:10-17)), and Defendant's failure to document the lots from which individual shipped goods were filled, the Court finds that Plaintiffs have established by a preponderance of the evidence that Defendant did indeed ship a substantial number of items pursuant to the Spring 2006 contract that contained the incorrect type of fill material, and that were therefore non-conforming.

Plaintiffs presented no results pertaining to tests performed on any Fall 2006 goods, and no evidence of any non-conforming Fall 2006 goods was presented at trial.  In addition, the Court finds that no evidence was proffered tending to show that the Fall 2006 goods that had been shipped prior to the cancellation of the contracts could not have been separated from the rejected Spring 2006 goods.

No further shipments or payments were made after June 21, 2006.  At that time, Plaintiffs had yet to pay Defendant on a number of invoices billed pursuant to the Spring 2006

contract and had not paid any amount for the goods supplied pursuant to the Fall 2006 contract, for

a total outstanding balance of $1,121,754.99.[6]  (Tr. 558:23-559:1, 560:21-562:6, 568:7-569:16,

571:5-25, 573:3-9; Exs. 112, NN.)  Plaintiffs removed the Sanidown products from their stores by

approximately June 26, 2006.  (Tr. 475:4-16; Ex. K (document entitled "Sanidown Product in

Stores & On Order as of 6/26/06").)  Macy's returned 69,192 units of goods to Sanidown early in

2007, 2,341 fewer units than are reflected in Plaintiffs' June 26, 2006, inventory.  (Tr. 676:8-14;

Exs. 79, 84, K.)  Macy's proffered no evidence tending to show that it removed the 2,341

unreturned units.  The Court finds that Macy's sold those items and therefore suffered no loss as a

result of their removal from stores.  Sanidown had charged Macy's $1,666,761.71 for the returned

goods.  (Ex. 79.)[7]  As Defendant charged Plaintiffs $862,000 for the returned Fall 2006

merchandise, it follows that $804,761.71 had been charged for the returned Spring 2006

merchandise.

            Following Plaintiffs' cancellation of the contracts and their return of the

merchandise, Defendant was left in possession of goods that were dirty and "not resalable."  (Tr.

331:12-14, 362:7-14, 903:15-904:25).  Defendant was also left with components it had already

---

[6]      This amount does not reflect Plaintiffs' withholding of $28,108.95 in expense
         offsets in 2006, as the Court has found those withholdings to have been
         unjustified, or the $150,000 rebate taken in January 2006, as the unpaid invoices
         were all issued in or after April 2006, i.e., after the rebate had been effectuated.
         As $862,000 was due for merchandise shipped pursuant to the Fall 2006 contract,
         the balance of the unpaid invoices, namely $259,754.99, was due for Spring 2006
         merchandise.

[7]      The June 26, 2006, inventory indicates that the "first cost" to Macy's for the
         71,533 units then in stock was only $1,104,641.23.  (Ex. K.)  However, these first
         costs reflect prices paid pursuant to the Fall 2006 contract, which were somewhat
         lower than those paid pursuant to the Spring 2006 contract for the same products,
         and therefore do not accurately reflect the prices actually paid for many of the
         goods then in stock.

purchased for the manufacture of further goods pursuant to the Fall 2006 contract.  (Tr. 787:23-10; Ex. C).  These components consisted of materials that could not be reused easily for other retailers because they were marked with Plaintiffs' brand names or otherwise made to Plaintiffs' custom specifications (Tr. 788:11-789:8), as well as down and feather filling that could be used in products for other retailers (Tr. 789:19-21).  Defendant presented no evidence distinguishing the cost of the customized materials from that of the generic filling material.

As explained credibly by Plaintiffs' damages valuation expert, Joseph McNulty, Plaintiffs lost all of the Sanidown product sales they would otherwise have made during the remainder of the Spring 2006 contract period, namely in July 2006, as a consequence of the removal of all Sanidown products from Plaintiffs' stores on or around June 26, 2006.  (Tr. 608:20-609:15.)  McNulty determined that Plaintiffs lost $613,000 in profits on those sales.  (Tr. 609:20.)  He did so by subtracting Plaintiffs actual profits from the Spring 2006 contract, which were earned between February 2006 and June 26, 2006, from Plaintiffs projected profits for the Spring 2006 period, which was scheduled to end on July 31, 2006.  (Tr. 609:21-611:15.)  He also noted that Plaintiffs' projections were "always within a standard deviation of five percent" as compared to actual sales, except on one occasion when actual sales exceeded projections by eighteen percent. (Tr. 626:24-627:4.)  He therefore deemed the projections sufficiently accurate to provide a basis for determining projected sales and profits.  The Court finds McNulty's testimony to have been credible and his methodology to be sound, and therefore finds that Plaintiff lost profits in the amount of $613,000 as a result of the cancellation of the Spring 2006 contract.

CONCLUSIONS OF LAW

Plaintiffs' Unjust Enrichment Claim

There is no dispute as to the existence, validity or enforceability of the underlying contracts. "The existence of a valid and enforceable contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter . . . . The causes of action for . . . unjust enrichment . . . are . . . quasi-contract claims and are therefore not viable . . . ." Levin v. Gallery 63 Antiques Corp., No. 04 Civ. 1504 (KMK), 2006 WL 2802008, at *19 (S.D.N.Y. Sept. 28, 2006) (internal quotation marks and citations omitted). Therefore, Plaintiffs' unjust enrichment claim fails.[8]

Plaintiffs' Fraudulent Inducement Claim

Plaintiffs have also asserted a claim, which they do not press in their post-trial submissions, that Defendant fraudulently induced them to enter into the Spring 2006 contract by misrepresenting the quality and content of its products. (Compl. ¶¶ 102-12.) Under New York law, in order to maintain a cause of action for fraudulent inducement, the claimant must allege fraud that is extraneous to the contract, occurring before the contract came into existence, and that leads the defrauded party to enter into the contract, rather than merely fraudulent non-performance of the contract. See Triangle Underwriters, Inc. v. Honeywell, Inc., 604 F.2d 737, 747 (2d Cir. 1979). Plaintiffs presented no evidence of any representation by Defendant occurring prior to the formation of the Spring 2006 contract, much less that Defendant knew any such representation to be false. See, e.g., Amida Capital Management II, LLC v. Cerberus Capital Management, L.P., 669 F. Supp. 2d 430, 444 (S.D.N.Y. 2009) (To establish fraudulent inducement under New York

---

[8]      Defendant's unjust enrichment claim was previously dismissed for the same reason. (See Aug. 5, 2009, Decision at 8-9.)

law the plaintiff must establish that the defendant "made a misrepresentation of a material fact, that

was known to be false and intended to be relied on when made, and that the plaintiff justifiably

relied on that misrepresentation to its injury."). Plaintiffs' fraudulent inducement claim is therefore

dismissed.

Plaintiffs' N.Y. U.C.C. Claims for Damages for Spring 2006 Contract Breach

A buyer who accepts goods later discovered to be defective or otherwise in breach

of the relevant contract may, under N.Y. U.C.C. Article 2, revoke his acceptance upon discovery of

the nonconformity, see N.Y. U.C.C. § 2-608, or accept the goods and seek damages for the loss

resulting from Defendant's breach, see N.Y. U.C.C. § 2-714.  See generally Cliffstar Corp. v.

Elmar Indus., Inc., 678 N.Y.S.2d 222, 222-23 (N.Y. App. Div. 1998).  Acceptance may be revoked

if the non-conformity was discovered after acceptance and "acceptance was reasonably induced . . .

by the difficulty of discovery before acceptance," N.Y. U.C.C. § 2-608(1)(b) (McKinney 2002),

but such revocation "must occur within a reasonable time after the buyer discovers or should have

discovered the ground for it . . . ," N.Y. U.C.C. § 2-608(2) (McKinney 2002).  Alternatively, a

buyer seeking damages in connection with goods whose acceptance was not revoked "must within

a reasonable time after he discovers or should have discovered any breach notify the seller of [the]

breach."  Id. § 2-607(3)(a).

Plaintiffs learned of the Matterhorn Comforter test failures from the CBHF and the

ADFC in April and May 2006, and of the additional test failures in June 2006.  Plaintiffs

terminated their business relationship with Defendant on June 21, 2006, and informed Defendant at

that time that, consequently, Plaintiff "had to return all of the goods to [Defendant]."  (Tr. 461:10-

12.)  The termination and return of Spring 2006 goods on hand, conveyed promptly after Plaintiffs

learned of the extent of the product test failures, constituted an effective revocation of the prior

acceptance of those goods.  See N.Y. U.C.C. § 2-608, cmt. 7 (buyer may revoke acceptance "as to

the entire lot or any commercial unit thereof").  Alternatively, the notification of termination

constituted notification pursuant to N.Y. U.C.C. § 2-607(3)(a) and thus preserved Plaintiffs' right

to recover damages for Defendant's breach.

Plaintiffs seek to recover the price paid for the Spring 2006 goods removed from

their stores and the profit lost on those removed goods for which they claim they were unable to

cover, namely the goods that would have been sold during the final month of the Spring 2006

season had they not been removed from stores and the Matterhorn Featherbeds (which were also

removed from the stores and which Plaintiffs maintain were discontinued after the Spring 2006

contract and consequently would have been offered for sale until depleted, rather than being

replaced by the next season's goods).  (See Pls.' Conclusions of Law ("Pls.' Br.") 3-5, 8-9.)

N.Y. U.C.C. § 2–711(1) provides for a properly revoking buyer's recovery of "so

much of the price as has been paid."  N.Y. U.C.C. § 2–711(1) (McKinney 2002).  Plaintiffs are

therefore entitled to recover the price paid for the goods that they removed from their stores and

returned to Defendant as a result of Defendant's breach of the Spring 2006 contract.  Plaintiffs

obviously may not recover the amount of unpaid invoices for the Spring 2006 program, and that

amount will therefore be subtracted from the price of the returned goods.  Therefore, Plaintiffs'

purchase price damages are $545,006.72 ($804,761.71 originally invoiced for Spring 2006

merchandise returned to Defendant, minus $259,754.99 in unpaid invoices for Spring 2006).

In addition to recovering the cost of purchasing the returned Spring 2006 goods,

Plaintiffs seek to recover the profits they would have realized on those goods had they not been

returned to Defendant.  A buyer who has accepted the goods and complied with the Section 2-

607(3)(a) notice requirement may "recover as damages for any non-conformity of tender the loss

resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable," N.Y. U.C.C. § 2-714(1) (McKinney 2002), and "[i]n a proper case any incidental and consequential damages under [Section 2-715] may also be recovered," N.Y. U.C.C. § 2-714(3) (McKinney 2002).  Consequential damages include lost profits, see, e.g., RIJ Pharmaceutical Corp. v. Ivax Pharmaceuticals, Inc., 322 F. Supp. 2d 406, 415 (S.D.N.Y. 2004) ("consequential damages for lost profits are recoverable where the buyer is a reseller or a broker"), as well as "any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise," N.Y. U.C.C. § 2-715(2)(a) (McKinney 2002).  Defendant was well aware that Plaintiffs resold the goods it supplied and thus had reason to know of Plaintiffs' "requirements and needs."  See id., cmt. 6 ("In the case of sale of wares to one in the business of reselling them, resale is one of the requirements of which the seller has reason to know within the meaning of subsection (2)(a)."); see also Afolabi v. Jones, No. 06 Civ. 2756 (RJD) (MDG), 2008 WL 4890166, at *4 (E.D.N.Y. Nov. 12, 2008).

As noted in the findings of facts, Plaintiffs lost profits of $613,000 for July 2006, the only month remaining in the Spring 2006 sales period, as a result of the removal of merchandise on June 26, 2006 (see infra p. 12), and are therefore entitled to recover that sum pursuant to N.Y. U.C.C. § 2-715.  Plaintiffs also seek $442,000 in lost profits relating to the Matterhorn Featherbeds that Plaintiffs contend they would have continued to sell beyond the end of the Spring 2006 period had these featherbeds not been returned to Defendant.[9]  Unlike the other Spring 2006 products that were included in the Fall 2006 contract, and for which Plaintiffs

---

[9]     Plaintiffs contend the amount is $489,000.  However, $47,000 of that amount relates to sales projected to have been made in July 2006 and is therefore included in the $613,000 of lost profits already recognized for that month.

apparently secured alternate suppliers, Plaintiffs made no attempt to cover the Matterhorn

Featherbeds by ordering the product from other vendors.  Furthermore, Plaintiffs presented no

evidence that cover could not eventually have been obtained.  Indeed, Nono testified that an

alternate source for replacement goods can usually be obtained within between six weeks and two

months.  (Tr. 416:1-16.)  As no evidence was presented that could form the basis for computing

lost profits during the two to four additional weeks beyond the end of July 2006 that would have

been required for Plaintiffs to obtain cover, and thus for which they would otherwise be entitled to

recover lost profits, Plaintiffs may not recover any lost profits for the Matterhorn Featherbeds not

already encompassed by the Spring 2006 damages.  See RIJ Pharmaceutical Corp., 322 F. Supp. 2d

at 415 ("'a calculation and award of lost profits may not be based on speculation'"(quoting

Coastal Aviation, Inc. v. Commander Aircraft Co., 937 F. Supp. 1051, 1063 (S.D.N.Y. 1996))).

Therefore, Plaintiffs are entitled to a total of $1,158,006.72 in damages on the Spring 2006 contract

(purchase price recovery of $545,006.72 plus lost profits of $613,000).

Defendant's N.Y. U.C.C. Counterclaims

> Fall 2006 Contract

> As the Court explained in the Dec. 16, 2009, Order, Plaintiffs improperly cancelled

the entire Fall 2006 contract, failing to observe the requirements of N.Y. U.C.C. § 2-609 relating to

demands for adequate assurances of performance.  Defendant seeks damages for breach of the Fall

2006 contract.  "Repudiation of a contract occurs when there has been an overt communication of

intention or an action which renders performance impossible or demonstrates a clear determination

not to continue with performance."  Emanuel Law Outlines, Inc. v. Multi-State Legal Studies, Inc.,

899 F. Supp. 1081, 1088 (S.D.N.Y. 1995) (internal quotation marks and citations omitted); see also

N.Y. U.C.C. § 2-610.  "'[A] wrongful repudiation of the contract by one party before the time for

performance entitles the nonrepudiating party to immediately claim damages for a total breach.'"

Id. (quoting American List v. U.S. News, 75 N.Y.2d 38, 40 (1989)).  Plaintiffs' termination of the

Fall 2006 contract clearly demonstrated their intention not to perform, and therefore constituted a

total breach of that contract.

    In light of Plaintiffs' breach, Defendant is entitled to recover "the difference

between the market price at the time and place for tender and the unpaid [Fall 2006] contract price

. . . less expenses saved."  N.Y. U.C.C. § 2-708(1) (McKinney 2002).  However, "[i]f the measure

of damages provided in subsection (1) is inadequate to put the seller in as good a position as

performance would have done then the measure of damages is the profit (including reasonable

overhead) which the seller would have made from full performance by the buyer."  N.Y. U.C.C. §

2-708(2) (McKinney 2002).  It was impracticable for Defendant to re-sell the rejected Fall 2006

merchandise in light of its poor condition and customization to Plaintiffs' specifications.  As to the

remaining Fall 2006 merchandise, it had yet to be assembled and Plaintiffs have identified no

authority requiring Defendant to cover by manufacturing and attempting to sell those goods to an

alternate buyer in order to recover lost profits.  The provisions of Section 2-708(1) are thus

"inadequate to put [Defendant] in as good a position as performance would have done," and

Defendant is entitled to recover its lost profits.  N.Y. U.C.C. § 2-708(2).  Cf. Emanuel Law

Outlines, 899 F. Supp. at 1089.

    Plaintiffs contend that lost profits may not be determined on the basis of mere

projections for orders for the Fall 2006 season, which is all that the Fall 2006 contract, or any other

contract between the parties, provides.  However, Plaintiffs' own lost profit damages were derived

using the projections embodied in the parties' Spring 2006 contract.  Furthermore, Plaintiffs'

damages expert testified that in the past Plaintiffs' projections never exceeded actual sales, to say

nothing of actual orders from Defendant, by more than five percent, and that in one recent season

sales had exceeded projections by eighteen percent. (<u>See</u> Tr. 626:5-627:4.)  The Court therefore

finds the projections embodied in the Fall 2006 contract to reflect accurately, and certainly do not

exaggerate, the quantities of products that Defendant would have supplied had the Fall 2006

contract been performed.

           Defendant is also entitled to recover the costs reasonably incurred in connection

with the manufacture of the first installment of Fall 2006 goods.  <u>See</u> N.Y. U.C.C. § 2-708(2).

Defendant proffered uncontroverted evidence that the Fall 2006 goods that it shipped to Plaintiffs

were returned in poor condition, making them unusable in merchandise for other buyers.  <u>See</u> N.Y.

U.C.C. § 2-709(1)(b) (providing for recovery of the contract price where "the circumstances

reasonably indicate that [an effort to resell the goods] will be unavailing"); <u>id.</u>, cmt. 3.  However,

Defendant is not entitled to recover the cost of purchasing raw materials in preparation for future

installments of the Fall 2006 contract as the evidence showed that at least some of these materials

could be utilized to fill other buyers' orders and that Defendant customarily kept inventory on

hand, and was inconclusive as to the proportion of these materials that was ruined or otherwise

unusable in connection with other buyers' products.  Therefore, Defendant is entitled to recover the

contract price as to the goods manufactured and delivered to Plaintiffs as the first installment of the

Fall 2006 contract in the sum of $862,000, plus 23.08 percent profits as to the remaining

$7,570,075, for an additional $1,747,173.31, totaling $2,609,173.31 in damages relating to the Fall

2006 contract.

Chargebacks

Defendant seeks to recover $2,782,505.87 it claims was withheld improperly by Plaintiffs between 2000 and 2006 on Defendant's invoices as chargebacks.  See N.Y. U.C.C. § 2-709(1)(a) (McKinney 2002) (providing that a seller is entitled to recover the price of goods accepted by the buyer).  Plaintiffs waived their statute of limitations affirmative defense as to this counterclaim by failing to assert it in their answer to Defendant's counterclaims or in a pre-answer motion to dismiss.  N.Y. C.P.L.R. § 3018(b); see also Mendez v. Steen Trucking, Inc., 680 N.Y.S.2d 134, 135-36 (App. Div. 1998) (reversing lower court's application of N.Y. U.C.C. § 2-725 limitations period where affirmative defense had not been asserted in answer).  Plaintiffs' affirmative defense of laches also fails because Defendant's counterclaim is not equitable in nature, as it is based on the contract law and the N.Y. U.C.C., and is thus not subject to the laches defense.  See, e.g., Ivani Contracting Corp. v. City of New York, 103 F.3d 257, 259 (2d Cir. 1997) (laches is an equitable defense that "bars a plaintiff's equitable claim where he is guilty of unreasonable and inexcusable delay that has resulted in prejudice to the defendant" (internal quotation marks and citations omitted)).  Finally, Plaintiffs also assert that the chargeback claim is barred by the affirmative defense of equitable estoppel, which requires Plaintiffs to prove, inter alia, "an act constituting a concealment of facts or a false misrepresentation."  Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Americas, 618 F. Supp. 2d 280, 297 (S.D.N.Y. 2009) (citing Gen. Elec. Capital Corp. v. Eva Armadora, S.A., 37 F.3d 41, 45 (2d Cir. 1994)).  Plaintiffs failed to prove that Defendant concealed any fact regarding the withholding of expense offsets, and thus failed to prove their equitable estoppel defense.

As Plaintiffs note in their post-trial memorandum, Defendant did not enter into evidence any of the actual contracts pursuant to which the merchandise relating to the contested

chargebacks was invoiced.  (Pls.' Br. 20-22.)  However, the testimony of Marissa Nono, Plaintiffs' own Senior Products Manager, established that the parties regularly entered into seasonal contracts similar to the Spring 2006 and Fall 2006 contracts.  Furthermore, it is undisputed that, from January 2000 through June 2006, Defendant supplied merchandise and sent invoices to Plaintiffs pursuant to these contracts, and that Plaintiffs did not pay all of the invoices in full.

Plaintiffs bear the burden of proving their entitlement to the chargebacks.  (See Aug. 5, 2009, Decision at 8.)  However, Defendant bears the initial burden of proving that Plaintiff took the specific chargeback it challenges in the first place.  The Court has found that Defendant failed to carry this burden as to the $2,782,505.87 that it seeks, that Plaintiffs admitted having withheld $126,193 in net chargebacks between January 1, 2000, and December 31, 2005, and that Plaintiffs failed to prove the legitimacy of those chargebacks.  (See supra pp. 4-5.)  Defendant is therefore entitled to recover $126,193 with respect to the chargebacks, for a total of $2,735,366.31 in damages ($2,609,173.31 in damages on the Fall 2006 contract, and $126,193 in improper pre-2006 chargebacks).

Pre-judgment Interest

New York law entitles the party prevailing on a breach of contract claim to pre-judgment interest.  N.Y. C.P.L.R. § 5001(a).  Interest is computed "from the earliest ascertainable date the cause of action existed" and, "where such damages were incurred at various times, interest shall be computed . . . upon all of the damages from a single reasonable intermediate date."  Id. § 5001(b).  Interest accrues at the rate of nine percent per annum unless otherwise provided in the contract.  Id. § 5004.  N.Y. C.P.L.R. § 5001 "grants courts wide discretion in determining a reasonable date from which to award pre-judgment interest."  Conway v. Icahn & Co., Inc., 16 F.3d 504, 512 (2d Cir. 1994).

In light of the time period during which Plaintiffs discovered the extent of Defendant's non-compliance with the Spring 2006 contract and the date of their termination of the Spring 2006 and Fall 2006 contracts, the Court finds that June 21, 2006, is the appropriate date from which the interest on the parties' claims relating to those contracts is to be computed.  Thus, Plaintiffs are entitled to $1,158,006.72 in damages, together with $551,179.86 in interest, for a total of $1,709,186.58, and Defendant is entitled to $2,609,173.31 in damages, together with $1,241,895.88 in interest, for a total of $3,851,069.19.  As Defendant's chargeback-related damages were incurred at various times during the period from January 1, 2000, until December 31, 2005, the Court finds that the appropriate date from which to calculate interest on the related claim is January 1, 2003.  Thus, Defendant is entitled to an additional $126,193 in damages, together with $124,742.52 in interest, for a total of $250,935.52 relating to chargebacks and $4,102,004.71 altogether.[10]  The parties' respective damages awards, after inclusion of interest, are subject to recoupment and set off, so as to produce a single award, to Defendant, consisting of the amount awarded to Plaintiffs subtracted from the amount awarded to Defendant, in the sum of $2,392,818.13.

---

[10]     Interest has been calculated as of December 23, 2010, on all amounts.

## CONCLUSION

For the foregoing reasons, Plaintiffs have prevailed on their N.Y. U.C.C. claims relating to the Spring 2006 contract and are entitled to recover a total of $1,709,186.58, Defendant has prevailed on its N.Y. U.C.C. claims relating to the Fall 2006 contract and certain chargebacks and is entitled to recover a total of $4,102,004.71. All other claims are dismissed. The Clerk of Court is respectfully requested to enter judgment awarding $2,392,818.13 to Defendant, each party to bear its own costs.

SO ORDERED.

Dated: New York, New York
       December 23, 2010

LAURA TAYLOR SWAIN
United States District Judge